[No. 27387. Department One. March 23, 1939.]

LONG LAKE LUMBER COMPANY *et al., Respondents,* v. THOMAS B. STEWART, *as Assignee, et al., Appellants.*[1]

*Edward M. Connelly* and *J. E. Close,* for appellants.

*Cannon, McKevitt & Fraser* (*F. J. Blade,* of counsel), for respondents.

[1]Reported in 88 P. (2d) 414.

BLAKE, C. J.—D. J. Wilson Box Company made a common law assignment for the benefit of creditors to Thomas B. Stewart. The latter, as assignee, entered into an agreement to sell assets of the trust estate to his cousin-in-law H. A. Mahr. The plaintiff creditors of the assignor brought this action to enjoin consummation of the sale. From a decree enjoining the sale and canceling the agreement between Stewart, as assignee, and Mahr, the latter appeals.

What we deem to be the controlling facts, established by the preponderance of the evidence, are as follows: On May 11, 1938, the creditors met with the assignee to determine what should be done with the remaining assets of the trust estate. After discussing the matter, the creditors adopted the following resolution:

"At a special meeting of the creditors of the D. J. Wilson Box Co., a corporation, at which there were present a majority of the creditors, together with Thomas Basil Stewart, the Assignee, a resolution was adopted authorizing and directing said Assignee to sell, or offer for sale, all the remaining assets of the D. J. Wilson Box Co., consisting of the real estate, notes, and accounts receivable. The same to be sold to the highest bidder on open bids, and to advertise the same for four weeks. The creditors or any other persons to have the right to submit bids for the same, or any part thereof.

"It was further resolved that the expense report of the Assignee be approved and that said Assignee be allowed $1,050, in full for his services as Assignee."

At this meeting, the value of the property to be sold was discussed. The creditors agreed among themselves that the property should bring not less than three thousand dollars, and that, if there were no bids in excess of that amount, they themselves would bid it in. The question also was discussed as to whether they should make a higher bid in the

event the assignee received bids in excess of that amount. Determination of this question, however, was left to the decision of representatives of two of the creditors. (Under undisputed evidence adduced at the trial, the property had intrinsic value in excess of six thousand dollars.) Whether the assignee was a party to this stipulation as to a minimum sales price, is a matter in dispute. But there is no doubt that he understood, at least, that the creditors had agreed among themselves that they intended to bid, or cause a bid to be made, in an amount of not less than three thousand dollars, in the event that any bids were received.

In compliance with the resolution, the assignee caused to be published the following notice of sale:

"Open bids will be received on any or all parts of the assets of D. J. Wilson Box Company, Spokane, composed of accounts, notes receivable; real estate, Latter contains 25 lots, buildings, subject to 1937 tax, railway spur. Located N. 2706 Morton. All assets subject to prior sale. Final filing date 12 o'clock noon, June 17th. Assignee reserves right to reject any bids. Contact Thomas Stewart, Assignee, S. 404 Cedar, Spokane, Riv. 0864, Glen 0035."

Under date of June 16th, Mahr submitted a bid to the assignee of two thousand dollars for the whole of the remaining assets of the trust estate. In making this bid, Mahr stipulated:

"I hereby make this offer subject to acceptance or rejection by twelve o'clock noon June 18th, 1938."

On June 18th, the assignee, in writing, notified Mahr of his acceptance of the bid. He received a thousand dollars of the purchase price and delivered to Mahr three promissory notes in the total of fifteen hundred dollars, which, apparently, were worth close to their face value. At any rate, they were the most liquid

of the assets. Also, under date of June 18th, the assignee, in writing, notified the creditors of the bid and its acceptance. Then, for the first time, did the creditors learn that any bid had been submitted, although for several days prior to June 17th their representatives had been trying to contact the assignee through the telephone numbers listed in the notice of sale. And, we may say that, in reading the testimony of the assignee, one cannot escape the impression that he was trying to avoid contact with the creditors. He admits that he designedly neglected to notify any of them of the bid or contemplated sale. His reason for this concealment is illumined by the following excerpts from his testimony:

"Q. You didn't, then, deem it necessary in your capacity as assignee for the benefit of creditors to in any manner discuss this sale with them, did you? A. Well, I couldn't very well without breaking faith with the man who had made the offer, you see. Q. Well, how would you be breaking faith with him? A. Well, I didn't feel that I could take his bid and go to them after the date that it was published and ask them if they would raise it. Q. Well, what made you think that they might raise it? A. I didn't know if they would raise it or wouldn't raise it; but I couldn't go to them and say that I had an offer for a specific amount and ask them what they would do about it. Q. You didn't think it was proper for you to notify the creditors, the people that you were working for, that this bid had been made, is that it? A. That is right. Q. You would be breaking faith with Mr. Mahr, is that true? A. That is right. Q. Because the creditors themselves might want to pay more for that property, is that true? A. No. Q. Well, how could you break faith with them, then? A. By disclosing the amount of his bid."

■■ In this, we think the assignee misconceived the course in which he should have been led in the exercise of good faith. With respect to Mahr, he was

a vendor dealing at arm's length. With respect to the creditors, he was a fiduciary upon whom devolved the duty to exercise the utmost good faith. The fact that Mahr was related to him by marriage should have made him the more zealous in the performance of that duty. He had in the notice of sale reserved the right to reject all bids. He knew that the creditors intended to make a bid of not less than three thousand dollars for the property. It is fairly inferable that, because of such knowledge, he reserved the right to reject bids.

Furthermore, we think the price bid by Mahr was grossly inadequate. For, as we have seen, the property was worth in excess of six thousand dollars. This fact, coupled with his concealment of the bid and his obvious evasion of the creditors, amounted to a breach of trust which warranted the court in setting the sale aside. 26 R. C. L. 1294. It is there said:

"Though it is the duty of a trustee not to sacrifice the property, mere inadequacy of price is no ground for charging him with lack of ordinary care, or setting aside the sale, providing the transaction is otherwise properly conducted. The fact that the price which property brought at a trustee's sale was grossly inadequate does not alone constitute a sufficient reason to impeach the genuineness or validity of the sale, unless the inadequacy was such as to shock the conscience or raise a presumption of fraud or unfairness. But where there is a serious inadequacy in the price realized, *the court will seize upon any incident of surprise, undue advantage, irregularity, or other equitable circumstance to grant relief,* and when the trustee is under no immediate necessity of selling, and there is no other object in the sale than to exercise his discretion of changing the form of the investment from real estate to personal, the fact that he sold it at a palpably inadequate price would, no doubt, be very persuasive evidence of fraud, such as would in-

duce a court of equity to vacate the sale on prompt application by the parties interested." (Italics ours.)

■ Mahr insists, however, that the sale cannot be set aside because he is an innocent purchaser for value. But we do not think he comes within the *bona fide* purchaser rule. One claiming the benefit of that rule, in connection with trust property, must hold the legal estate. It will not suffice that he is a vendee under a contract of sale from the trustees. 4 Bogert on Trusts and Trustees, § 805. The vendee cannot enforce an equitable interest in trust property created through a breach of trust by the trustee. Restatement of the Law of Trusts, § 286. It is there said:

"Although a person to whom the trustee transfers trust property is a bona fide purchaser under the rule stated in § 284, even though the trust property which is transferred is an equitable interest (see § 285), and although a person in whom the trustee creates a legal interest in the subject matter of the trust is a bona fide purchaser under the rule stated in § 284, a person in whom the trustee in breach of trust purports to create merely an equitable interest in the trust property whether the trust property in which the interest is created is legal or equitable is not a bona fide purchaser, even though he pays value and has no notice of the breach of trust, and he cannot enforce the equitable interest, unless the beneficiary is estopped."

Since the assignee in this transaction was guilty of a breach of trust, we are of the view that Mahr, being merely a contract vendee, is not entitled to claim the benefit of the innocent purchaser rule.

Decree affirmed.

JEFFERS, MAIN, STEINERT, and ROBINSON, JJ., concur.